291 P.2d 895

**CONSOLIDATED URANIUM MINES, Inc., a corporation, Plaintiff,**

v.

**TAX COMMISSION of the State of Utah, Defendant.**

No. 8339.

Supreme Court of Utah.

Dec. 21, 1955.

Gustin, Richards & Mattsson, Salt Lake City, for plaintiff.

C. Preston Allen, Salt Lake City, for defendant.

WADE, Justice.

Review of a decision of the Tax Commission assessing a mine occupation tax against the Consolidated Uranium Mines, Inc. under the provisions of Sections 59–5–66 and 59–5–67, U.C.A.1953, which insofar as pertinent here read as follows:

"59–5–66. Definitions.—(a) The term, 'person,' as used in this act, includes any individual, partnership, company, joint stock company, corporation, association, or any group or combination acting as a unit, and the plural as well as the single number."

"59–5–67. Except as herein otherwise specifically provided, every person engaged in the business of mining or producing ore containing gold, silver, copper, lead, iron, zinc or other valuable metal in this state shall pay to the state of Utah an occupation tax equal to one per cent of the gross amount received for or the gross value of metalliferous ore sold which tax shall be in addition to all other taxes provided by law. Said tax shall be delinquent on the first day of June next succeeding the calendar year when the ore or metal is sold.

\*　　\*　　\*　　\*　　\*　　\*

"An annual exemption from the payment of the occupation tax imposed by this act upon \$50,000 in gross value of [ore] shall be allowed to each person, provided but one exemption shall be allowed for one claim or group of claims operating under one ownership":

It is the contention of the plaintiff that the Commission erred in making the assessment against it because it claims it is not the entity which operates a group of claims under one ownership as a mine. It argues that it does not operate the claims which it has leased from various owners in Temple Mountain Mining District, Emery County, Utah, but that it has subleased individual claims to various individuals and each of these is the entity or person which operates the particular claim and entitled to the \$50,000 exemption from the payment of the occupation tax in gross value of the ore.

■ The facts are that plaintiff has leased from various owners the unpatented mining claims involved in this case which covers an area of about 200 acres, as well as other claims in Temple Mountain Mining District, in all covering an area of over 6,000 acres. Under the terms of this lease plaintiff agreed to enter and work the mining claims, supply materials for the dis-

covery and development of these claims and do all the necessary assessment work and pay a certain royalty on ores sold. Plaintiff did some explorative and development work and found the ore bodies which were formed in more or less disconnected channels or beddings varying in width from 4 to 20 feet and in thickness from 2 to 18 feet. Because the channels were more or less disconnected, it was found more economical to sink shafts and remove the ore from each individual unit in which ore was discovered, rather than sink a central shaft to the depth of the average ore level and run tunnels to each of the ore bodies or some other like method. To accomplish this, plaintiff entered into written contracts engaging certain individuals as independent contractors to mine units of the claims it had leased, the contractor to supply all mining equipment, supplies and labor necessary except those of a more permanent nature, which were supplied by plaintiff. The contractor was to deliver the ore to the surface where the plaintiff would take it and transport it to the buying station and after receiving payment from the government for the ore would deduct the transportation charges and pay the contractor 50% of the proceeds. Nowhere in the agreement is the contractor referred to as a lessee or the instrument as a lease, or the plaintiff as lessor, which would have been the simple and ordinary way of denomination if it had been the intention of the parties to enter into a landlord and tenant relationship, rather than that of employer and employee. Aside from nomenclature, there are no provisions in the agreements for the demising or renting of the properties to the contractors. At most the plaintiff agreed "(a) To give to the Contractor and its employees engaged in the work access to the premises," but except for such purpose conferred no right of possession upon the contractor. Bouvier's Law Dictionary, 1934 Ed. defines a lease in part as: "A species of contract for the possession and profits of lands and tenements either for life or for a certain period of time, or during the pleasure of the parties." In 32 Am.Jur. Section 2, page 28, it is said:

" * * * Again, as ordinarily employed, the word 'lease' implies a term and a reversion to the owner of the land after its termination, and only a chattel interest passes thereunder. A lease has been defined as a contract for the possession and profits of lands and tenements on the one side, and a recompense of rent or other income on the other. It has, moreover, been defined as a conveyance by one to be known as the 'landlord' to another to be known as the 'tenant,' ordinarily for a term of years, but sometimes at will or for the life of the tenant, in consideration of a return of rent or other recompense. The term 'demise' carries the idea of a grant. It is defined as a 'lease or conveyance for a term of years,' and it is said that a lease is a 'conveyance by way of demise'. * * *"

Under the agreement, the contractor having no right of possession, it would have been error for the Commission to have found that he was a lessee, even though there was testimony that the contractors considered themselves to be lessors of their units. In view of the fact that plaintiff did not sublease its claims, the evidence that the units were not mined by the use of one central shaft connected by tunnels, but rather were mined by the use of separate shafts and not connected to other units by tunnels fails to establish that these units are separate mines operated under separate ownership. It is not necessary that any single one of the factors above referred to be regarded as controlling. But under all of the circumstances shown, we are not prepared to say that the Commission erred in concluding that the plaintiff was the entity which operated all these units under one ownership and was therefore entitled to only the one exemption.

Plaintiff also contends that the Commission unlawfully used the production figures for the entire year of 1953 as a basis for the tax imposed because until October, 1953, under Sec. 1809(b) of the Atomic Energy Act, 42 U.S.C.A. § 1809 " * * * The Commission, and the property, activities, and income of the Commission, are expressly exempted from taxation in any manner or form by any State, * * *." We agree. All the claims involved herein were unpatented. The provisions of Title 42, Section 1805(b) (7) before its amendment in 1954, 68 Stat. 716, provided after reserving fissionable source materials on public lands for the use of the United States and that the Secretary of the Interior should cause to be inserted in every conveyance or permit such reservation,

"That any lands so patented, conveyed, leased, or otherwise disposed of may be used, and any rights under any such permit or authorization may be exercised, as if no reservation of such materials had been made under this subsection; except that, when such use results in the extraction of any such material from the land in quantities which may not be transferred or delivered without a license under this subsection, such material shall be the *property* of the Commission, and the Commission may require delivery of such material to it by any possessor thereof after such material has been separated as such from the ores in which it was contained. If the Commission requires the delivery of such material to it, it shall pay to the person mining or extracting the same, or to such other person as the Commission determines to be entitled thereto, such sums, including profits, as the Commission deems fair and reasonable for the discovery, mining, development, production, extraction, and other services performed with respect to such material prior to such delivery, but such payment shall not include any

amount on account of the value of such material before removal from its place of deposit in nature. If the Commission does not require delivery of such material to it, the reservation made pursuant to this paragraph shall be of no further force or effect." (Emphasis ours.)

In the instant case there is no question but what all the materials were required by the Commission and delivered to it. Since the Act itself makes all such materials, under such circumstances, the "property" of the Commission, and since by the express wording of Sec. 1809(b) all "property" of the Commission was until October 1, 1953, exempt from any taxation by a State, it is apparent that any taxation of such materials since 1946 and prior to October 1, 1953, was prohibited. However, the Tax Commission argues that it is not taxing the materials delivered to the Atomic Energy Commission prior to October 1, 1953, but since the Occupation Tax is a license tax, it was merely using the gross amounts received for ores sold during the entire year of 1953 as a base for the occupation tax for 1954, and, therefore, the provisions of Sec. 1809(b) before its amendment in 1953 would not apply to the tax involved in this case. The fault with that argument is that it ignores the provisions of Sec. 59-5-67, U.C.A.1953. Although, it is true that a license fee or tax may be, and usually is, required to be paid before the business which is licensed may be carried on, the legislature in our Mining Occupation Tax

specifically provided that: "Said tax shall be delinquent on the first day of June next succeeding the calendar year when the ore or metal is *sold*." (Emphasis ours.) This clearly indicates that the legislature intended that the tax base should be on the "gross amount received for or the gross value of metalliferous ore sold" and of course that cannot be ascertained until after the occurrence of one of those events. Since the tax is not delinquent until the first day of June next succeeding the calendar year when the ore or metal is sold, this indicates that the tax is on the metal mined in the year prior to the year in which the tax becomes delinquent, and, therefore, an imposition of such a tax based on sales other than those made in the calendar year sought to be taxed violates the provisions of the Act. The Tax Commission, therefore, erred when it purported to base its assessment for the year 1954 on sales made during the year 1953.

Each party to bear its own costs.

McDONOUGH, C. J., and CROCKETT and WORTHEN, JJ., concur.

HENRIOD, Justice (dissenting).

I dissent from that portion of the main opinion which holds that the 16 operations by 16 different operators under contract was an operation of a group of claims under one ownership, and from the position of the main opinion that the contractors in the agreement were employees of Consolidated.

To justify its position, the main opinion makes certain statements which this writer believes should be answered.

It is stated that "Nowhere in the agreement is the contractor referred to as a lessee or the instrument as a lease, or the plaintiff as lessor". This circumstance proves nothing.

The opinion goes on and says: "Aside from nomenclature, there are no provisions in the agreements for the demising or renting of the properties to the contractors. At most the plaintiff agreed '(a) To give to the Contractor and its employees engaged in the work access to the premises,' but except for such purpose conferred no right of possession upon the contractor." Most of the quoted language has no basis in fact and is itself contradictory. It is impossible for this writer to determine how giving access to the premises is not giving a right of possession,—which is the contradictory part of the quoted language. As to the actual facts with respect to who had the right of possession, let us look at the agreement itself. The contractor agreed to mine 300 tons of ore per month and to transport it from the workings, to timber the workings, keep the mine safe, to comply with applicable labor statutes with respect to labor employed on the work, indemnify Consolidated against injuries to the contractor's employees, to permit the Consolidated access to the mine to inspect it, to pay all costs for labor, blasting, powder, etc., to save Consolidated harmless from liens on the premises. The Consolidated agreed to give access to the described premises, to transport the ore mined by the contractor, and to furnish the contractor with pipe, timber, rails, mine cars and other equipment. They both agreed that all ore mined by the contractor should be sampled, that contractor should perform *in the mine* not less than 100 shifts per month, and that Consolidated would defend its title in the courts in order to protect the contractor. How the main opinion possibly can say that the contractor was not given possession in the light of all the provisions mentioned which could not be performed without possession, is fanciful to this writer.

As against the contention of the majority opinion that the agreement entered into was not a sublease, but one of an employer-employee relationship, the following facts not only completely contradict such contention, but clearly establish a leasehold agreement under the very definitions of a lease pronounced in the main opinion:

The agreement specifically demises the property for a definite term when it says it shall continue for one year, and shall be extended automatically for another period "if the mine is in operation and the terms of this agreement have been complied with at the expiration of such period," and for all ores mined and shipped the parties were each to have 50% of the net mill returns. Under the terms of the agreement, the Consolidated could not terminate the same except for default in complying with its

242

provisions, and in fact termination is absolutely controlled by the contractor, who, under its terms, can terminate by giving 10 days notice. Consolidated could be refused permission to come on the premises, even, except to inspect. Two miners, having contracts with Consolidated identical to that in evidence, clearly, by their testimony, eliminated any element of control on the part of Consolidated, just as did the contract. Consolidated's engineer substantiated this testimony, and this evidence was uncontradicted. How an employer-employee relationship can be arrived at under these circumstances, where there is no evidence of control whatever, is impossible to determine. As if to emphasize the leasehold character of the instrument, the last provision states that "The contractor shall at all times during the term of this agreement have and exercise full and complete direction and control of the work."

It is highly interesting and significant to compare the agreement in this case with the form lease found at page 360 of Morrison's Mining Rights, 16 ed., and note that substantially every provision in the one is incorporated in the other with unsubstantial variations in royalties, phraseology, etc.

Simply because a company has a number of properties and even though they be contiguous necessarily does not mean that if it leases out without any element of control reserved except to inspect, it is operating a group of claims under one ownership, since the fact that it leases its property and

strips itself of control of operations, except to make a claim for breach of contract, militates against a conclusion that it is operating a claim, a group of claims or anything else except in a role of lessor, who incidentally may agree to furnish some equipment, but who can demand no kind of operation save what is said in the instrument,—in this case a matter which is completely within control of the contractor.